The STATE of Missouri, on the Information of *John* C. DANFORTH, Attorney General, at the relation of Donald R. Griffin, et al., Petitioner and Relators,

v.

Patrick J. HICKEY, Respondent.

No. 57451.

Supreme Court of Missouri,
En Banc.

Jan. 27, 1972.

1. All references to constitutional sections are to the Constitution of Missouri, 1945, V.A.M.S., and more particularly to Ar-

John C. Danforth, Atty. Gen., and Richard M. Marshall, Clayton, for relators.

Joseph L. Walsh, St. Louis, Eugene P. Walsh, Clayton, for respondent.

FINCH, Chief Justice.

This is an original proceeding in quo warranto the object of which is to oust respondent as a member of the House of Representatives on the theory that by removing his residence from the district from which he was elected (which relators allege respondent has done) he has vacated his office under the provisions of Article III, § 13 of the Constitution of Missouri.[1] That section provides as follows: "If any senator or representative remove his residence from the district or county for which he was elected, his office shall thereby be vacated."

The language of § 13 is both clear and mandatory. There is no question but that the people intended thereby that the office of a representative (or senator) is vacated by him if in fact he moves his residence from his district. However, unless the representative concedes that he has moved his residence and vacated his office, a hearing and decision by an appropriate tribunal is required. Normally, under our system of separation of functions of government into executive, legislative and judicial departments, the function of making judicial determinations is vested in the courts. For example, in the recent case of State ex inf. Danforth v. Orton, Mo., 465 S.W.2d 618, this court received evidence on the issue of whether respondent sheriff had been guilty of conduct which would result in vacating his office, and, having found in the affirmative, ousted respondent in a quo warranto proceeding.

In this case, however, the contention is made that we have no jurisdiction to determine the question raised by this quo war-

ticle III thereof, unless otherwise indicated.

ranto proceeding. Respondent has filed a motion to dismiss wherein he contends that the power to enforce § 13 is vested exclusively in the House of Representatives of which he is a member, and that the judicial branch of government, including this court, has no right to decide the fact issue of whether he has moved his residence or to enforce the ouster provision if he has. We conclude that the motion is well taken and the proceeding is dismissed.

The resolution of the issue raised by the motion to dismiss involves the determination of the meaning and application of § 18 of Article III, which provides, insofar as pertinent to this issue, as follows: "Each house * * * shall be sole judge of the qualifications, election and returns of its own members; may determine the rules of its own proceedings * * * and, with the concurrence of two-thirds of all members elect, may expel a member; * * *."

In State ex inf. Danforth v. Banks, Mo., 454 S.W.2d 498, this court held that § 18 confers on the House of Representatives the exclusive right to determine whether persons elected as representatives possess the qualifications prescribed under Article III, § 4, as prerequisites of assuming said office. There seems to be no doubt but that this is the universal rule. Annotation, 107 A.L.R. 205, 209; 49 Am.Jur. 251; 81 C.J.S. States § 34, p. 943. In their brief relators recognize and agree with this

principle. Their brief states: "Relator wholeheartedly agrees with the principle that legislative bodies historically have been and should properly be the sole judge of the qualifications of their members to election and seating."

The dispute between the parties herein, and the issue we must decide, arises over whether application of § 18 is limited solely to questions of original qualifications (under § 4 as to representatives and § 6 as to senators) and any contests over elections, as relators claim, or whether it has application to other sections of Article III. Respondent asserts that the question of qualification is a continuing one, applying any time a question arises as to whether a member of either house of the general assembly is qualified to take his seat, or, having been seated, whether he has lost his qualification and hence his seat. In addition to § 13, which is the specific section involved in this case, this contention would encompass § 12, which provides that the office of a senator or representative is vacated if he accepts any employment with the United States, the State of Missouri or any municipality thereof, and § 15, which relates to disqualification resulting from failure to take the oath of office not to take money or other valuable thing for performance or nonperformance of any act or duty pertaining to his office, or as a result of violating said oath.[2]

2. Insofar as pertinent to this issue, these two sections provide as follows:

"Section 12. No person holding any lucrative office or employment under the United States, this state or any municipality thereof shall hold the office of senator or representative. When any senator or representative accepts any office or employment under the United States, this state or any municipality thereof, his office shall thereby be vacated and he shall thereafter perform no duty and receive no salary as senator or representative. * * * *"

"Section 15. Every senator or representative elect, before entering upon the duties of his office, shall take and subscribe the following oath or affirmation:

'I do solemnly swear, or affirm, that I will support the Constitution of the United States and of the state of Missouri, and faithfully perform the duties of my office, and that I will not knowingly receive, directly or indirectly, any money or other valuable thing for the performance or nonperformance of any act or duty pertaining to my office, other than the compensation allowed by law.' * * * Any senator or representative refusing to take said oath or affirmation shall be deemed to have vacated his office, and any member convicted of having violated his oath or affirmation shall be deemed guilty of perjury, and be forever disqualified from holding any office of trust or profit in this state."

This court has not decided a case involving the question of whether § 18 vests in the appropriate legislative body the exclusive right to decide all issues arising under §§ 12, 13 or 15 of Article III. However, our examination of cases from other jurisdictions and general texts convinces us that the generally recognized rule in this country has been that constitutional provisions such as § 18 vest sole authority in the legislative body of which the senator or representative is a member to decide whether he has forfeited his office and should be ousted for reasons arising during his term but after he has been seated.

In Lessard v. Snell, 155 Or. 293, 63 P.2d 893, a duly elected and seated state senator was alleged to have accepted employment as attorney for the state aid commission, in violation of a specific constitutional prohibition. Apparently, the secretary of state proposed to notify the senator's home county election officials that a vacancy had occurred as a result of the senator accepting the other position. Suit was brought by the senator to enjoin the secretary of state from so doing. The court did in fact enjoin the secretary of state, holding that a constitutional provision that "Each house, when assembled, shall * * * judge of the election, qualifications, and returns of its own members," reserved to the senate the sole and exclusive jurisdiction to determine the eligibility of the senator, and that neither the courts nor the secretary of state had any authority to pass upon such eligibility. This was true even though the question related to alleged disqualification which occurred after the senator had taken office rather than to his qualification to be seated at the outset.

In State ex rel. Biggs v. Corley, 6 W. W.Harr. 135, 36 Del. 135, 172 A. 415, the contention was made that certain senators during their legislative terms had been appointed to other state offices and as a result had forfeited their legislative offices. In a suit seeking to mandamus the lieutenant governor to issue writs of election for the purpose of filling vacancies alleged to exist in the senate as a result of these occurrences, the court held that the courts are not the tribunals provided by the constitution to decide such questions and have no jurisdiction to do so. Instead, the senate or house, as the case may be, has sole jurisdiction under the constitutional provision that gives the appropriate legislative body the right and power to be the judge of the elections, returns and qualifications of its own members.

After citing various authorities to support its conclusion, the court said, 172 A. l. c. 422:

"The relator seeks to avoid the force and effect of these authorities by asserting that the question before the Court is not one of qualifications, but whether the persons here are or are not members of the legislature. This argument is not new. It begs the question. It would compel us to decide a question which we have no right to decide for the reason that we have neither jurisdiction to determine nor power to enforce a judgment based upon such determination. It is admitted that a house of the Legislature is the ultimate judge of the right of a person to a seat therein, and, as said by Judge Agnew in Com. v. Allen, supra [70 Pa. 465], 'It would ill become a court of justice to attempt to displace a member of Assembly. Its desertion of its appointed orbit would be followed by such a display of incompetency to effect its purpose as would be its most signal rebuke.'"

Likewise, in Covington v. Buffett et al., 90 Md. 569, 45 A. 204, the case involved an instance in which a state senator allegedly had accepted a federal office and removed from the county from whence he was elected, thereby creating a vacancy in the office. The suit sought to mandamus the board of supervisors of election of that county to print the name of petitioner on the ballot as nominee for said office of state senator. The court denied any relief and affirmed the dismissal of the petition. In so holding, the court recognized that the controlling question was whether the court

had jurisdiction to determine whether a vacancy existed in the office of state senator. The court then said, 45 A. 1. c. 205:

" * * * The question, then, as stated, comes to this: Does a vacancy exist in the office of senator for Talbot county. in the senate of Maryland, and has the court power to determine the question? It is too clear, we think, for serious controversy, that section 19, art. 3, of the constitution names the only tribunal which has the power to decide the question, and that is the senate of Maryland itself. * * * In the case at bar the courts are without jurisdiction to entertain the proceedings, for the reason that each house of the general assembly has the sole power to judge of the qualifications of its members, to the exclusion of every other tribunal."

Subsequently, at 1. c. 206, the court said:

" * * * We hold that this court has no jurisdiction to determine whether a vacancy exists in the office of senator for Talbot county, and, unless a vacancy does exist, no election can be had for the purpose of electing a senator. The courts are without jurisdiction to compel the appellees to place the name of the appellant on the official ballot until the tribunal having the exclusive authority under the constitution to decide whether a vacancy exists passes upon that question."

In State ex rel. Martin v. Gilmore, 20 Kan. 551, 27 Am.Rep. 189, relator instituted a proceeding seeking to remove Gilmore, a member of the house of representatives, on the basis that he had forfeited his office by being guilty of a state of intoxication in a public place while a legislator. The opinion of the Kansas Supreme Court, written by Judge Brewer, later an Associate Justice on the Supreme Court of the United States, held that the court could not oust Gilmore, saying (27 Am.Rep. 1. c. 192):

"The Constitution declares, article 2, section 8, that 'Each house shall be judge of the elections, returns, and qualifications of its own members.' This is a grant of power, and constitutes each house the ultimate tribunal as to the qualifications of its own members. .The two houses acting conjointly do not decide. Each house acts for itself, and by itself; and from its decision there is no appeal, not even to the two houses. And this power is not exhausted when once it has been exercised, and a member admitted to his seat. It is a continuous power, and runs through the entire term. At any time, and at all times during the term of office, each house is empowered to pass upon the present qualifications of its own members. By section 5 of the same article, acceptance of a Federal office vacates a member's seat. He ceases to be qualified, and of this the house is the judge. If it ousts a member on the claim that he has accepted a Federal office, no court or other tribunal can reinstate him. If it refuses to oust a member, his seat is beyond judicial challenge. This grant of power is, in its very nature (and so as to any other disqualification), exclusive; and it is necessary to preserve the entire independence of the two houses. Being a power exclusively vested in it, it cannot be granted away or transferred to any other tribunal or officer. It may appoint a committee to examine and report, but the decision must be by the house itself. It, and it alone, can remove."

French et al. v. Senate of State of California, 146 Cal. 604, 80 P. 1031, involved a case in which petitioners, who had been duly elected state senators who had qualified and been seated, thereafter were expelled by the senate for malfeasance in office consisting of taking a bribe to influence their conduct as senators. In this proceeding they sought an order of mandamus to compel the senate to admit them as members. The court denied relief, saying (80 P. 1. c. 1032):

"Even if we should give these allegations their fullest force in favor of the pleader, they do not make a case justifying

the interposition of this court. Under our form of government the judicial department has no power to revise even the most arbitrary and unfair action of the legislative department, or of either house thereof, taken in pursuance of the power committed exclusively to that department by the Constitution. It has been held by high authority that, even in the absence of an express provision conferring the power, every legislative body in which is vested the general legislative power of the state has the implied power to expel a member for any cause which it may deem sufficient." Subsequently, after saying that in California the power was expressly given by the Constitution to the senate to do what it had done, the court said, l. c. 1032: "There is no provision authorizing courts to control, direct, supervise, or forbid the exercise by either house of the power to expel a member. These powers are functions of the legislative department, and therefore, in the exercise of the power thus committed to it, the Senate is supreme. An attempt by this court to direct or control the Legislature, or either house thereof, in the exercise of the power, would be an attempt to exercise legislative functions, which it is expressly forbidden to do."

In State ex rel. Ford v. Cutts, 53 Mont. 300, 163 P. 470, Cutts was seated by the House of Representatives as successor to a member who had died. Thereafter, the attorney general sought leave to file a complaint in the nature of quo warranto to try the right of Cutts to act as a member of the House of Representatives. The application was denied, the court saying, 163 P. 470:

"We cannot and should not take jurisdiction of this proceeding because it must end in nothing. Each House is the judge of the ultimate right of persons claiming seats as members thereof. (Constitution of Montana, art. 4, § 9; State ex rel. Thompson v. Kenney, 9 Mont. 223, 232, 23 P. 733), and its decision, right or wrong, is conclusive upon us (State ex rel. Smith v.

District Court, 50 Mont. 134, 138, 145 P. 721; Cooley, Const.Lim. [7th Ed.], p. 189, and cases cited, note 1). Being powerless to enforce any judgment of ouster against a person recognized by either House as a member thereof, the utmost we could do would be to decide an abstract question of law; the courts of this state are not instituted for that purpose."

In the chapter on States, Territories, and Dependencies, 49 Am.Jur. 251, in § 34—Determination of Qualifications, Election, and Terms of Members, the applicable rule is stated thus: "The Constitutions of most, if not all, of the states contain provisions to the effect that each house of the state legislature shall be the judge of the election and qualifications of its own members. And it is well settled that such a provision vests the legislature with sole and exclusive power in this regard and deprives the courts of jurisdiction of these matters. Such a declaration is a grant of power and constitutes each house the ultimate tribunal as to the qualifications of its own members. The two houses acting conjointly do not decide, but each house acts for itself and by itself, and from its decision there is no appeal, not even to the two houses. This power is not exhausted when once it has been exercised and a member admitted to his seat; it is, on the contrary, a continuous power, and runs through the entire term. At any time, and at all times during the term of office, each house is empowered to pass on the present qualifications of its own members." See also 49 Am.Jur. 252, § 35, and 81 C.J.S. States §§ 33c and 34, p. 942.

We conclude that the universally accepted interpretation of provisions such as Article III, § 18, has been that state legislative bodies are given the sole right to determine the qualifications of their members, and that this is a continuing power, giving not only the right to decide whether a member shall be seated originally, but also whether the member becomes disqualified during his period of office and as a result vacates his office.

The arrangement and placement of these various sections in Article III of the Missouri Constitution support the conclusion that the foregoing rule is what the framers of our Constitution intended. Section 4 specifies the qualifications of representatives, and § 6 the qualifications of senators. Thereafter, § 12 provides that the senator or representative vacates his office if he accepts certain prohibited offices or employment; § 13 provides for vacation of the office if the senator or representative removes his residence from the district or county; and § 15 provides for vacating the office and for disqualification for either refusing to take the oath of office or violating the same. Thereafter, in § 18 it is provided that each house shall be the sole judge of the qualifications, election and returns of its own members. If the drafters of the Constitution had intended that this power to determine qualifications should be limited solely to determining whether persons met the qualifications set out in §§ 4 and 6, as well as settling any election questions which might arise, it would seem reasonable that § 18 would have been placed immediately following §§ 4 and 6 and ahead of §§ 12, 13 and 15. The fact that it was placed after those sections indicates, we conclude, that it was intended that the determination of qualifications under §§ 12, 13 and 15 also should be determined by the appropriate legislative body pursuant to the provisions of § 18.

In this connection, we note that in the case of In re Falzone, 240 Mo.App. 877, 220 S.W.2d 765, the Court of Appeals considered a proceeding seeking to disbar Falzone as a lawyer on the basis that he had taken a bribe while a member of the state senate. Previously, the senate had instituted proceedings to oust Falzone as a member of that body because he had violated Article III, § 15 of the Constitution by taking a bribe. While that hearing was in progress, Falzone resigned from the senate, thereby terminating the proceeding to oust him. In the subsequent disbarment proceeding a transcript of testimony taken in the senate hearing was offered and received in evidence, over objection. On appeal, the court held that the transcript was admissible on the basis that the senate in conducting the hearing to oust Falzone was exercising a "judicial function," making the transcript competent at the trial of the same issue in the disbarment proceeding. That holding is consistent with the cases from other states holding that constitutional provisions such as § 18 vest in the legislative body the function of judicially determining whether a member has violated some constitutional provision and should be ousted on that account.

By adopting Article III, § 18, the people have placed in the legislative body the power of determining the qualifications of members of the general assembly, including whether they have forfeited or vacated their office by violating such provisions as §§ 12, 13 and 15. Only the people may change that provision. We cannot, and must not, undertake to amend such constitutional provision by judicial interpretation. To do so would violate Article II, § 1 of the Missouri Constitution, relating to separation of powers. If § 18 is to be altered and the power of removal vested in the courts, such change can be accomplished only by constitutional amendment approved by vote of the people.

Respondent's motion to dismiss is sustained.

All of the Judges concur.