**STATE of Missouri ex rel. Donald J. GRALIKE, Relator,**

v.

**Eugene WALSH et al., Respondents,**

**Brick Storts, III, Intervenor-Respondent.**

No. 57995.

Supreme Court of Missouri,
En Banc.

July 14, 1972.

Opinion Concurring in Part and Dissenting in Part July 17, 1972.

Rehearing Denied July 21, 1972.

John D. Connaghan, St. Louis, for relator.

Arthur S. Margulis, St. Louis, for the Board.

Robert C. McNicholas, City Counselor, David S. Hemenway, Associate City Counselor, St. Louis, for defendants John T. Wiley, Francis M. O'Brien, James A. Kearns, and Mrs. Clarence Hunter.

Norman A. Selner, Clayton, for intervenor.

FINCH, Chief Justice.

This is an original proceeding in prohibition which seeks to prohibit respondent election boards from placing the name of intervenor Storts on the Primary ballot as a candidate for the Democratic nomination for State Senator from the First Senatorial District. The basis of such request is the contention that Storts, when he filed his declaration of candidacy on March 8, 1972, was not a resident of said district and that he did not comply with the requirement contained in Article III, § 6, of the Constitution of the State of Missouri, V.A.M.S. (also § 21.070, V.A.M.S., which is identical in language with Article III, § 6), that "Each senator * * * shall have been * * * a resident of the district which he is chosen to represent for one year, if such district shall have been so long established, and if not, then of the district or districts from which the same shall have been taken." We make our rule in prohibition absolute.

We issued our provisional rule on June 27, 1972, and directed that issues of fact raised by respondents' returns should be heard by Judge Ninian M. Edwards, Presiding Judge of the Twenty-first Judicial Circuit, pursuant to Supreme Court Rule 97.04, V.A.M.R. He was directed to make findings of fact and then make return of said proceedings to this Court. This has been done and Judge Edwards' findings and conclusions certified to us are as follows:

## FINDINGS OF FACT

"1. That the Plaintiff, Donald J. Gralike, resides at 648 Buckley Road, St. Louis County, Missouri, which is within the First State Senatorial District, and which said district is described in Plaintiff's Exhibit 1, received herein in evidence.

"2. That the Plaintiff, Donald J. Gralike, is a Democratic Party candidate for the office of State Senator from said First State Senatorial District, having duly filed therefor.

"3. That the Intervenor-Respondent, Brick Storts, III, has filed with the Secretary of State of the State of Missouri, on March 8, 1972, a declaration for Democratic Party candidate for nomination for the office of State Senator for the First State Senatorial District.

"4. That Intervenor-Respondent, Brick Storts, III, purchased a certain parcel of property known as 93G of Building 93 in Chateau de Ville condominium section No. 5, on October 1, 1971, and which said property is located at 4290 Chateau de Ville, St. Louis County, Missouri, and said property is within the First State Senatorial District.

"5. That the Intervenor-Respondent, Brick Storts, III, occupied property at 200 South Brentwood Road, Clayton, St. Louis County, Missouri, from and after April, 1971, continuously, until April 28, 1972, which said property was not within the said First State Senatorial District.

"6. That on or about the 28th day of April, 1972, the Intervenor-Respondent, Brick Storts, III, physically occupied his property at 4290 Chateau de Ville, St. Louis County, and that on or about that date he sub-let his premises at 200 South Brentwood Road, Clayton, Missouri, for the balance of the term of his lease, to-wit until March 3rd, 1972 (sic).

"7. That on the 4th day of April, 1972, the said Intervenor-Respondent, Brick Storts, III, registered to vote with the St. Louis County Board of Election Commissioners showing for the first time his address as being at 4290 Chateau de Ville, St. Louis County, Missouri."

## CONCLUSIONS OF LAW

"That, based upon the above Findings of Fact, the Court does find and conclude as a matter of law, that the Intervenor-Respondent, Brick Storts, III, did not reside within the First State Senatorial District for the period of time required by law, and that by reason thereof, is not qualified for

the office of State Senator of the First State Senatorial District."

The factual determinations by Judge Edwards are not disputed in the briefs filed in this Court. The only contentions asserted are these:

(1) That this Court is without jurisdiction to determine the qualifications of a candidate for the State Legislature for the reason that the exclusive right of determining such qualifications is reserved by Article III, § 18, of the Missouri Constitution to the legislative body of which he seeks to become a member. In this connection, it is contended further that for the Court to decide such question would violate Article II, § 1, of the Constitution of Missouri relative to separation of powers;

(2) Assuming, arguendo, that the Courts do have jurisdiction to determine qualifications for candidacy, prohibition is not the appropriate remedy because respondent boards are performing merely ministerial duties, as to which they are not subject to prohibition; and

(3) The durational residency requirement of one year's residence in the district as a condition to eligibility to serve as a State Senator violates the equal protection clause of the Fourteenth Amendment to the Constitution of the United States.

We consider these questions in the order stated.

Article III, § 18, of the Missouri Constitution has been construed and applied by this Court in the recent cases of State ex inf. Danforth v. Banks, Mo., 454 S.W.2d 498, and State ex inf. Danforth v. Hickey, Mo., 475 S.W.2d 617. In Banks the ouster of a member of the House of Representatives was sought by quo warranto on the basis that he was not qualified for the office because he had not been a resident of the district one year before his election and hence was improperly seated. Hickey involved a proceeding to oust a Representative on the basis he had moved his residence from his district during his term of office, in violation of Article III, § 13, of the Missouri Constitution. In both cases this Court held that Article III, § 18, makes the appropriate legislative body the exclusive forum for determining the qualifications, election and returns of its own members, and that this Court did not have jurisdiction in either case.

In the case now presented, we deal with a different situation. Various persons have filed declarations of candidacy seeking to be nominated in the Primary Election as the candidate of the Democratic Party for State Senator for the district in question. One of these persons is intervenor Storts. He is not presenting himself at this time as the duly elected Senator from that district. He seeks only the opportunity to be a candidate for the nomination.

Respondents contend that the restrictive language of Article III, § 18, applied in Banks and Hickey, governs in this instance as well. We do not agree. The constitutional language in question provides that "Each house * * * shall be the sole judge of the qualifications, election and returns of its own members; * * * *" Such language, in our view, is not broad enough to prevent the determination by the courts of whether one who seeks to be a candidate at a Primary Election possesses the requisite qualifications.

Two cases cited to us are consistent with this conclusion. In State ex rel. Bates v. Remmers, 325 Mo. 1175, 30 S.W.2d 609, the issue was whether one Nangle should appear on the Primary ballot as a Republican candidate for State Senator. The contention was made that he filed his declaration of candidacy with the Secretary of State when it should have been filed with the Board of Election Commissioners. When the Secretary of State certified Nangle as a candidate to the Board of Election Commissioners and over protest they proposed to print his name on the ballot, prohibition was sought. No mention

was made of Article III, § 18, of the Constitution, but the Court issued a permanent writ of prohibition, keeping Nangle's name off of the Primary ballot.

In State ex rel. O'Reilly v. Kirkwood, Mo.App., 407 S.W.2d 613, an election contest had been filed contesting the nomination of O'Reilly as the Democratic nominee for State Representative. Mr. O'Reilly objected to a trial of the case because no summons had been served on him. When the case was set, over his objection, he sought prohibition in the St. Louis Court of Appeals. Again, no reference to Article III, § 18, of the Constitution was made. The Court held that the Primary Election Code (§§ 124.010 to 124.050, V.A.M.S.) required service of a summons and that without such service a hearing could not proceed, but went on to say, 407 S.W.2d l. c. 614: "It appears, however, that there may yet remain sufficient time for service of such summons and therefore our final judgment in prohibition is that the respondent is prohibited from proceeding to hear the election contest until such time as a summons informing the contestee of the time of the hearing shall be served upon him in accordance with the law." In so stating, the Court of Appeals necessarily considered the Primary Election statutes as being applicable to elections to select nominees for the General Assembly.

To repeat, the position of respondents is that the entire election process of members of the General Assembly, including examination of whether prospective candidates for the nomination possess constitutionally mandated qualifications, is to be examined and passed upon only by the appropriate legislative body, and that the courts have no jurisdiction whatsoever in this area. This, say respondents, is the scope and meaning of Article III, § 18, of the Constitution.

This interpretation of the constitutional provision would mean that a 15-year-old resident of Illinois could file a declaration of candidacy for State Senator in Missouri, and even though the facts were undisputed, the courts could do nothing to prevent his name from appearing on the ballot. Respondents say that the solution rests only in the hands of the electorate and the body in which the particular person seeks membership. Likewise, if a Primary Election was held and there were widespread charges of counting and voting fraud, the courts, according to the position of respondents, would be unable to accept and hear a Primary Election contest under the Primary Election contest statutes adopted by the General Assembly.

We do not accept respondents' interpretation of the scope of Article III, § 18. In our view, it applies when a General Election has been held and one then presents himself for membership, and, of course, it also applies in instances after the person has been seated and question as to his qualifications and right to remain a member arises. This interpretation appears to be in harmony with procedure which the General Assembly has established. In §§ 124.110 through 124.150, V.A.M.S., the General Assembly has made provision for a procedure to be followed when there is a contest of the propriety of the election of a member of the General Assembly at a General Election. Those statutes provide the notice to be given, the manner of taking depositions, and certifying testimony, with the ultimate decision as to the contest to be made by the appropriate house of the General Assembly. No such procedure has been established by the General Assembly with respect to Primary Election contests, indicating, we think, that the General Assembly had in mind that Primary Election controversies would be decided by the courts.

█ Intervenor urges that the interpretation we adopt would result in interference with the prerogative of the legislative body under Article III, § 18, to pass upon and decide the question of qualification and election of its members. He suggests that if a court passes upon the qualifications of one to be a candidate in the Pri-

mary Election and holds that such person is a proper candidate, that issue will already have been decided and be binding upon the legislative body if that person is successful and ultimately presents himself for seating; or, in the alternative, the judicial decision is nullified and rendered meaningless. We do not agree with this conclusion. The legislative body will retain its right under Article III, § 18, to judge the qualifications of its members. The fact that a court has concluded that one had sufficient qualifications to be a candidate will not be res adjudicata so far as the legislative body is concerned when it ultimately passes upon qualifications of that person to be a member of the legislative body. The action of the court will settle only the proposition that the person shall not be denied the right to be a candidate. No violation of the separation of powers doctrine occurs.

■ The next contention presented by respondents is that prohibition is not the proper remedy even if it be determined that the courts have jurisdiction to determine qualifications of a person seeking a place on the ballot as a candidate for legislative office. This argument is based on the proposition that the acts to be performed by respondent election boards are purely ministerial, rather than judicial in nature, and as such not subject to prohibition.

We conclude that this question has been settled in this state by the cases of State ex rel. Bates v. Remmers, 325 Mo. 1175, 30 S.W.2d 609; Mansur v. Morris, 355 Mo. 424, 196 S.W.2d 287; and State ex rel. Danforth v. Alford, Mo., 467 S.W.2d 55, in all of which prohibition was utilized to prohibit clerks or election boards from placing on the ballot the name of the candidate found to be without requisite qualifications for the office. In Alford, the most recent of those cases, this Court said, 467 S.W.2d l. c. 57:

"Finally, we think it should be noted that prohibition is an appropriate remedy to prevent an election official from having the name of an ineligible candidate printed on the ballot. This court so held in State ex rel. Bates v. Remmers, 325 Mo. 1175, 30 S.W.2d 609, and Mansur v. Morris, 355 Mo. 424, 196 S.W.2d 287. It is certainly in the public interest that ineligible candidates be excluded from the ballot. This for the reason that if such a candidate should receive the highest number of votes the election, in effect, would have been a nullity and the county and other candidates would be put to the expense and trouble of another election. And, even if the ineligible candidate did not receive the highest number of votes there would be the undesirable result that those who voted for him were, in effect, disfranchised."

Respondents cite and rely particularly on the case of State ex rel. Wulfing v. Mooney, 362 Mo. 1128, 247 S.W.2d 722, as authority that prohibition is an inappropriate remedy. However, Mooney does not sustain respondents' position. In that case the Court distinguished various cases in which election boards had been prohibited from doing certain acts. One of those cases was State ex rel. Bates v. Remmers, supra. In discussing that and other cases, this Court said, 247 S.W.2d l. c. 726:

"In the above cases the election boards in each particular instance were not applying the applicable law to the question they had before them and we issued our writs of prohibition for that reason. On the other hand, in the case at bar the board of election commissioners were complying with the applicable statutes and were therefore acting in a ministerial capacity."

In the instant case the boards of election commissioners are not following the language of Article III, § 6, of the Missouri Constitution or § 21.070, V.A.M.S., when they propose to print Storts' name on the ballot. Therefore, the earlier election board cases such as Remmers are applicable here. Judge Edwards has found that intervenor Storts moved to this Senatorial District in April, 1972, that he has not

lived in the district one whole year next before the upcoming General Election, and that he is not qualified under the provisions of Article III, § 6, of the Constitution or § 21.070, V.A.M.S. Hence, under our prior decisions, prohibition will lie.

In oral argument counsel did not argue that the courts would be powerless to act if jurisdiction is assumed, but suggested that perhaps mandamus, rather than prohibition, would be the appropriate remedy. In that connection, we repeat what this Court said in Mansur v. Morris, 196 S.W.2d 1. c. 294:

"And unless we assume the failure of Sec. 11558 to provide a procedure for the correction of errors in primary ballots means such corrections cannot be enforced (which assumption we cannot make), then it follows that the remedy under that section also should be nontechnical. Hence we cannot permit ourselves to be impaled on narrow distinctions, between prohibition, mandamus, certiorari and injunction. Ordinarily mandamus is the proper remedy to compel the discharge of ministerial functions, but not to control the exercise of discretionary powers. State ex rel. Richardson v. Baldry, 331 Mo. 1006, 1011(2), 56 S.W.2d 67, 69, 70(2). The decisions reviewed in this opinion compel the conclusion that the duties of the county clerk under Sec. 11558 are not purely ministerial; and that he has a measure of discretion.

"But in either event he cannot usurp judicial functions. Yet in this case he has, in effect, assumed to decide that relator Mansur is eligible for the office of magistrate, and that his name as a candidate therefor should go on the primary ballot— notwithstanding the decision of State ex inf. McKittrick v. Wilson, supra, 350 Mo. 486, 166 S.W.2d 499, 143 A.L.R. 1465, decided in 1942, and the opinion of the Attorney General rendered on the specific facts involved here. This is not meant as a criticism. He probably took that position in order that an adjudication of the question might be obtained. But we are convinced that under the foregoing facts prohibition was the proper remedy below."

We overrule respondents' second contention.

■ Finally, intervenor Storts urges that the durational residency requirement for qualification for the office of State Senator (Article III, § 6, of the Constitution and § 21.070, V.A.M.S.) fails to provide equal protection of the laws to all classes of citizens and hence violates the Fourteenth Amendment to the Constitution of the United States. He relies on the cases of Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274; Turner v. Fouche, 396 U.S. 346, 90 S.Ct. 532, 24 L. Ed.2d 567; and Bolanowski v. Raich, D.C., 330 F.Supp. 724.

Dunn was a case involving whether residency requirements of one year in the state and three months in the county as a condition to voting violated the equal protection clause of the Fourteenth Amendment. The Supreme Court of the United States held that a compelling state interest for these durational voting requirements was not shown and hence they were excessive and violated the equal protection clause. The opinion did not consider or deal with a requirement that one be a resident of the state or county a prescribed period of time in order to be a candidate and, if elected, serve as a state or county officer. The latter, in our view, is a different question than that of what durational residency may be required under the equal protection clause as a prerequisite to voting. We do not consider that Dunn mandates a determination that the requirement of residency of one year in the senatorial district to be a state senator is in violation of the Fourteenth Amendment.

Turner v. Fouche, supra, was a case involving the constitutionality of the method used in many Georgia counties to select juries and school boards. Without getting into all the facts, it suffices to say the case involves whether the constitutional and statutory plan was violative of the equal protection clause of the Fourteenth Amendment, and whether the procedure,

even if constitutional, was unconstitutionally administered so as to result in the selection of a disproportionate percentage of whites over blacks. It also involved the validity of limitation of school board membership to freeholders. The Court held that the requirements amounted to invidious discrimination and were invalid. It is clear that Turner does not rule the question presented in this case.

Finally, intervenor cites a United States District Court case from Michigan, Bolanowski v. Raich, 330 F.Supp. 724. That case involved the constitutionality under the equal protection clause of the Fourteenth Amendment of a requirement in the City Charter of Warren, Michigan, that one must have been a resident of the city three years to be a candidate for mayor. The Court held the requirement to be violative of the equal protection clause. However, the Court, l. c. 729, in discussing whether the rulings with respect to voting rights should apply to provisions establishing residency requirements for office holding, stated: "The question seems to be an open one at the Supreme Court level."

We agree with the statement in Bolanowski that the Supreme Court has not held that durational residency requirements which are conditions for becoming a candidate and, if elected, for holding state or county office, are violative of the equal protection clause. We recognize that Bolanowski concluded that the three-year residency requirement in the case of Warren, Michigan, did violate the Fourteenth Amendment, but in our view the one-year residency in the district required by the Constitution of Missouri to be eligible for the office of State Senator does not violate the equal protection clause of the Fourteenth Amendment.

Durational residency, citizenship, and age requirements as conditions to holding office, both federal and state, have been provided throughout the history of the country. Examples are found in the Constitution of the United States which makes provisions of this character with respect to the President (Article II, § 1), the Senate of the United States (Article I, § 3), and the House of Representatives (Article I, § 2). The State of Missouri has such requirements with respect to the Governor of the State (Article IV, § 3), State Senators (Article III, § 6), State Representatives (Article III, § 4), and Judges of the various courts of the state (Article V, § 25). Absent a controlling decision by the Supreme Court of the United States holding to the contrary, we hold that the equal protection clause of the Fourteenth Amendment does not eliminate the right of the State of Missouri to establish and enforce the one-year residency in the district requirement as a condition to serve as State Senator, and we overrule this contention by intervenor Storts.

■ Although not necessary to the decision of this case, we add this caveat with reference to future applications for extraordinary writs with respect to election questions in comparable situations. There were compelling reasons for this Court to hear this particular case and to settle the question of whether our decisions in Banks and Hickey are applicable where qualification questions for membership in the General Assembly arise in connection with a Primary Election. Having resolved that question, subsequent applications for extraordinary relief of this nature should be made to the Circuit Court, pursuant to Supreme Court Rule 84.22, V.A.M.R. Sufficiently prompt handling and final disposition of such cases, needed in view of the necessarily short timetable involved, can and should be given. This will necessitate that such applications for extraordinary writs be made at the earliest opportunity after the question arises, and that thereafter the case be handled with dispatch by all involved in order not to interfere with the orderly functioning of the election process.

Provisional rule in prohibition made absolute.

DONNELLY, MORGAN, HOLMAN and HENLEY, JJ., concur.

SEILER, J., concurs in part and dissents in part in separate opinion.

BARDGETT, J., not participating.

SEILER, Judge (concurring in part and dissenting in part).

I concur with those parts of the majority opinion which establish our jurisdiction and which find that prohibition is the proper remedy.

However, I respectfully dissent on the equal protection aspect of the case. In my opinion, the one year durational residence requirement for qualification for state senator provided in Art. III, Sec. 6 of the Missouri Constitution, V.A.M.S., violates the Equal Protection Clause of the United States Constitution because, without reason or purpose, it discriminates against the intervenor and those who are in the same class as him and it discriminates against qualified voters who might want to cast their votes for intervenor or someone in his same position. Art. VI of the United States Constitution states: "This constitution . . . shall be the supreme Law of the Land . . .", and Art. I, Sec. 4 of the Missouri Constitution accepts, as it must, that principle when it states: "That Missouri is a free and independent state, subject only to the Constitution of the United States . . . "

The only justification mentioned by the majority for the one year residence requirement is that historically it has always been that way. This, in my opinion, is not particularly relevant or persuasive. Historically, it used to be that 21 was the age for voting. Now it is 18. Historically, only men had the right to vote. Now, both men and women can vote. Historically, only men could serve on juries. Now women can also. Times are changing. In ancient days when regions were remote from each other, it served an important state interest to require a candidate to be a

resident for a year before being eligible for election to office. This is no longer true and we should not cling to a restriction which has outlived its usefulness. There is no compelling interest of Missouri which is served by denying to the voters of the first senatorial district the right to vote for a candidate who has not lived in the district during the year prior to the election, if they choose to vote for him.

In a 1970 case involving the statutory system used in Georgia counties to select juries and school boards, the United States Supreme Court held that there exists " . . . a federal constitutional right to be considered for public service without the burden of invidious discriminatory disqualifications . . . " and that a state " . . . may not deny to some the privilege of holding public office that it extends to others on the basis of distinctions that violate federal constitutional guarantees". Turner v. Fouche, 396 U.S. 346, 362–363, 90 S.Ct. 532, 541, 24 L.Ed.2d 567. The issue of heavily unequal burdens to qualify for a position on the ballot was discussed in the case of Williams v. Rhodes, 393 U. S. 23, 30–31, 89 S.Ct. 5, 10, 21 L.Ed.2d 24, where the court said: " . . . In determining whether or not a state law violates the Equal Protection Clause, we must consider the facts and circumstances behind the law, the interests which the State claims to be protecting, and the interests of those who are disadvantaged by the classification. In the present situation the state laws place burdens on two different, although overlapping, kinds of rights— the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively. Both of these rights, of course, rank among our most precious freedoms. We have repeatedly held that freedom of association is protected by the First Amendment. And of course this freedom protected against federal encroachment by the First Amendment is entitled under the Fourteenth Amendment to the same protection from infringement by the States . . ."

The threefold test of Williams v. Rhodes for determining whether a state law violates the Equal Protection Clause was most recently used in Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 1003, 31 L.Ed.2d 274, 284, where a Tennessee election law requiring potential voters to reside in the state for one year and in the county for three months as a qualification for voting was struck down. There the court said: "In sum, durational residence laws must be measured by a strict equal protection test: they are unconstitutional unless the state can demonstrate that such laws are *necessary* to promote a *compelling* governmental interest' . . ."

In the case before us there is no rational or reasonable purpose to uphold the durational residence requirement in Art. III, Sec. 6. Relator argues it should be upheld because representatives of the people must have knowledge about their district and its needs. Living in a district does not necessarily bear any significant relationship to knowledge of the district or its needs. Consider the person who has lived just across the street from the district boundary line or the businessman who works in the district but who actually lives outside the district. These people, as a matter of fact, could be just as well acquainted with the district's problems as anyone in the district —lifelong resident or not. In Kramer v. Union Free School District, 395 U.S. 621, 632, 89 S.Ct. 1886, 1892, 23 L.Ed.2d 583, the court held that New York state could not limit the vote in school district elections to property owners and parents of school children. New York claimed it had a legitimate state interest in limiting the vote to the property owners whose taxes paid for the school system and to those who had a direct interest in school affairs because their children were in school. The court said: "Whether classifications allegedly limiting the franchise to those resident citizens 'primarily interested' deny those excluded equal protection of the laws depends, *inter alia*, on whether all those excluded are in fact substantially less interested or affected than those the statute includes. In other words, the classifications must be so tailored so that the exclusion of appellant and the members of his class is necessary to achieve the articulated state goal . . ."

The purported goal of insuring knowledgeable and competent representation is not achieved by the durational residence requirement. Since it does not fulfill the need for which it was designed, the requirement should not be allowed to stand and deprive intervenor and his class and the electors of the district of their constitutional rights. The right of a state to place reasonable restrictions on the availability of the ballot, or by analogy to candidacy for office, is not involved here. Dunn v. Blumstein, supra 92 S.Ct. at 1000, 31 L.Ed.2d at 281; Carrington v. Rash, 380 U.S. 89, 91, 85 S.Ct. 775, 13 L.Ed.2d 675; Pope v. Williams, 193 U.S. 621, 632, 24 S.Ct. 573, 48 L.Ed. 817. The challenge is to the unreasonableness of durational residence requirements. Our state's durational residence requirement violates the rights of political association of the district electors in that it prevents them from banding together and supporting, or bringing in, an outsider of their choice and thus effectively disparages their vote by denying them the opportunity to vote for the candidate of their choice on election day. Residents who do not support an outsider do not have their rights infringed upon by having an outsider on the ballot because they have a fully effective vote and can cast it for whomever they choose. If they feel the outsider is not competent or knowledgeable enough to adequately represent them, they can defeat him at the polls, as they do many of their fellow residents under the present system. It is the residents who support an outsider or latecomer who have their rights infringed upon and are denied an effective vote without reason or compelling state interest. It must be noted that an individual who expresses a bona fide intention to become a resident and who actually does, as the intervenor

did here, completely eliminates any fear of "carpetbagging" or political control from the outside which is not responsive to the electorate. This overly broad, arbitrary exclusion is exactly what the United States Court was trying to correct in Carrington v. Rash, supra, where it found the Texas voting residency requirements too broad for the purpose for which they were intended. There, many bona fide resident servicemen were being denied the vote in order to make sure that non-resident servicemen were excluded.

Bolanowski v. Raich, E.D.Mich.S.D., 330 F.Supp. 724, decided before Dunn v. Blumstein, supra, articulates the rationale later used in Dunn in a factual situation very similar to this case. The facts dealt with a municipal election which required an extra year of residency in order to run for the office of mayor. After examining the facts and the law, the trial court found there was no need for this extra year requirement in today's society, if there had ever been one, and it must be struck down, absent a showing of a compelling state interest, as violative of the Equal Protection Clause of the United States Constitution. As the court said: 330 F.Supp. l. c. 731: " . . . It requires little imagination to conceive of an adult citizen of the City of Warren who has lived his entire life there without taking any interest whatsoever in municipal problems, and who would thus not fit the articulated qualifications sought to be insured by the requirement . . ." Likewise it is easy to imagine an individual, such as intervenor herein, who has lived within the district for less than a year and who has demonstrated his interest in the district and the people of the district. There is no valid reason or compelling state interest for an individual who expresses an interest and willingness to serve to be kept off the ballot just because he has not lived in the district he

seeks to serve for one year. The very purpose of the requirement, to insure competent, interested representation, is defeated by keeping such an individual off the ballot.

The state may very well be able to require state officeholders to live in their districts once elected, or it may even require candidates to be bona fide residents, in order to insure that the officeholder or candidate has some reasonable contacts with and availability to his constituency. But to require a candidate to be a resident of a district *before* he seeks office not only violates the rights mentioned earlier, it also unreasonably infringes on his right to travel and move about freely. Because an individual exercises his constitutional right of travel, the state cannot strip him of his exercise of political rights in order to protect the status quo and to limit potential challengers to present officeholders or longtime residents. United States representatives are merely required to be residents of the states from which they are elected and not the particular congressional district and representation does not seem to have suffered.

The American people constitute a highly mobile society. Between March of 1969 and March of 1970, 18.4 percent of the persons over one year of age who live in the United States moved to a different residence.[1] Thirty six and five tenths million persons moved in one year. Only 7.1 million of those moved between states, while 23.2 million moved intracounty and 6.3 million moved somewhere else in the same state. In May of 1958, only 25 percent of the population over 18 years of age in the North Central states had lived in one residence. Residence was defined as a political unit such as an incorporated city or county. Moves within a city or within

1. U.S. Bureau of the Census, Current Population Reports, Series P–20, No. 210, "Mobility of the Population of the United States: March 1969 to 1970," U.S. Printing Office, Washington, D.C., 1971, page 1.

a rural area in the same county were excluded from the tables. Thirty percent of the population had lived at two residences, while 21 percent had lived at three. Seven and seven tenths percent of the population had lived at six or more residences.[2]

These are exactly the kinds of incidents and studies that prompted the court to strike down durational residency requirements for recipients of welfare benefits in Shapiro v. Thompson, 394 U.S. 618, 89 S. Ct. 1322, 22 L.Ed.2d 600 and to strike down voting durational requirements in Dunn v. Blumstein, supra.

The direction in which the law is progressing is clear and this court should not allow the constitutional rights of the intervenor and his class and the electors of Missouri to continue to be deprived by an unconstitutional provision of the Missouri Constitution. The steps this court should take are clear, Art. III, Sec. 6 of the Missouri Constitution imposes a heavily unequal burden on the ability of candidates to obtain a position on the ballot, depending merely on whether or not they have lived for one year within the state senatorial district, and it deprives the electors of the district of the full force of their ballot and there has not been any compelling state interest shown here to justify this sort of unequal treatment. All the one year residence requirement does is to serve provincialism and prejudice the newcomer and those who would support him politically.

In my opinion, under Carrington v. Rash, supra; Turner v. Fouche, supra; Kramer v. Union Free School District, supra; Dunn v. Blumstein, supra, and Bolanowski v. Raich, supra, we cannot sustain the validity of the constitutional durational residence provision in question and we should discharge the preliminary rule.

2. U.S. Bureau of the Census, Current Population Reports, Series P–23, No. 25, "Lifetime Migration Histories of the

American People", U.S. Government Printing Office, Washington, D.C., 1968, p. 5 and Table 7.