Eugene R. **BOLANOWSKI**
v.
Joseph S. **RAICH**, Clerk, City of Warren, Michigan.
Civ. A. No. 36649.

United States District Court,
E. D. Michigan, S. D.
July 9, 1971.

———◆———

Robert J. Lord, Warren, Mich., for plaintiff, Alexander B. Ritchie, Detroit, Mich., Clark, Klein, Winter, Parsons & Prewitt, Detroit, Mich., of counsel.

Sherman Faunce II, John J. Murray, William S. Wolanin, Thomas Landy, Warren, Mich., for defendant.

## OPINION

FEIKENS, District Judge.

This is an action brought by Eugene R. Bolanowski, a potential candidate for the office of Mayor of the City of Warren, Michigan, on behalf of himself and all registered electors of the City.

Plaintiff claims that Section 7.2 of the City Charter unreasonably burdens his right to run for office and the right of the electors to vote for the candidate of their choice, in violation of the Equal Protection Clause of the Fourteenth Amendment.

The complaint was filed on June 14, 1971, and a hearing was held pursuant to an order to show cause on June 21, 1971. Because of the imminence of the primary election and the consequent need for immediate determination of the issues presented, on June 25, 1971, this court ordered that plaintiff Bolanowski's name be placed on the ballot because Section 7.2 of the Charter of the City of Warren violated the Equal Protection Clause. This opinion sets forth the reasons for that ruling.

On May 12, 1971, plaintiff filed with defendant City Clerk his declaration of candidacy for nomination for the office of Mayor, which was accepted along with the required fee. On June 14, 1971, he filed this action seeking declaratory and other relief under Title 28 United States Code, Sections 2201[1] and 2202,[2] on grounds that Section 7.2 of the Charter was in violation of the Equal Protection Clause and that defendant Clerk was about to make a determination under that section that he was ineligible to file for office.

On June 18, 1971, the defendant Clerk did send plaintiff a letter informing him that:

"* * * your filing for the candidacy for the Office of Mayor in the City of Warren Primary Election of August 3, 1971, is rejected and invalid, due to your not meeting Section 7.2 of the City of Warren Charter * * *

---

1. Section 2201 provides:
    "In a case of actual controversy within its jurisdiction, except with respect to Federal taxes, any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such."

2. Section 2202 provides:
    "Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment."

"Therefore, you are ineligible to be a candidate for the Office of Mayor at the Primary Election to be held on August 3, 1971 in the City of Warren."

The issue has thus been joined, and an "actual controversy" exists within the meaning of the Declaratory Judgment Act, *supra*. It is clear that this court has jurisdiction to determine the issues herein. Evers v. Dwyer, 358 U.S. 202, 79 S.Ct. 178, 3 L.Ed.2d 222 (1958). The court also finds that this is a proper class action under Rule 23, Federal Rules of Civil Procedure, and that it is therefore proper to consider the rights of the electors of the City along with the rights of the plaintiff.

I

Section 7.2 of the Charter of the City of Warren provides:

" * * * the Mayor shall be a person who has been a resident of the city for at least three years immediately prior to the *filing* of his nominating petition or declaration of candidacy, and who possesses the further qualifications prescribed in Chapter 4 of this Charter." (Emphasis added.)

Section 4.2 states:

"Except as otherwise provided in this charter, a person is eligible to *hold* an elective city office if he has been a registered elector of the city * * * for at least two years immediately preceding his election * * * " (Emphasis added.)

Under Section 4.1 of the Charter, the elective offices of the City are "the Mayor, the nine Councilmen, the Clerk, the Treasurer, and * * * the two Municipal Judges." Plaintiff meets the "registered elector" requirement of Section 4.2, but he has not been a resident of the City for three years as required by Section 7.2.

The language of Section 7.2 goes only to plaintiff's ability to file as a candidate, since it appears that he is presently qualified to *hold* office under Section 4.2 of the Charter. Of course, the practical effect of the two sections taken together is that plaintiff is prevented both from running in the mayoral primary and holding the office of Mayor, and thus the electors of the City are prevented from voting for him, or any other person similarly situated. Plaintiff is not prevented by Section 7.2 from running for any other elective office of the City. The additional one-year residency requirement in Section 7.2 affects only those who wish to file for, or vote in, mayoral elections.

Plaintiff does not challenge the two-year "registered elector" requirement. What he does claim is that the additional one-year "resident of the City" requirement created by Section 7.2 disenfranchises him of his right to be considered for public service and also disenfranchises the electors of the City of their right to vote for him or any other person in his situation as a candidate for nomination. He claims that a municipal statutory classification which classifies candidates so as to selectively distribute the right to run for office (and thus the right to vote) must be justified by a compelling municipal interest. And, he argues, no compelling interest of the City of Warren justifies the classification which requires an extra year of residency for mayoral candidates, as opposed to other candidates for office. The City, on the other hand, seeks to rely on the presumption in favor of the constitutionality of a legislative act. It claims that the right to become a candidate for Mayor is a right or privilege of city citizenship, not national citizenship; that it therefore has the unquestioned power to impose reasonable residency restrictions on candidacy; and that the three-year residency requirement is a reasonable classification designed to serve a legitimate municipal aim.

II

In recent times, these opposing contentions as to municipal and state powers to regulate residency and other conditions for candidacy and voting have afforded the federal courts, including the

Supreme Court, much opportunity for discussion of the requirements of the Equal Protection Clause. Several basic principles have become clear.

States *do* have "unquestioned power to impose reasonable residence restrictions on the availability of the ballot. Pope v. Williams, 193 U.S. 621 (1904) [24 S.Ct. 573, 48 L.Ed. 817]." Carrington v. Rash, 380 U.S. 89, 91, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965). But no discrimination may be made between individuals in violation of the federal constitution. *Id.* There exists "a federal constitutional right to be considered for public service without the burden of invidiously discriminatory disqualifications," and a state "may not deny to some the privilege of holding public office that it extends to others on the basis of distinctions that violate federal constitutional guarantees." Turner v. Fouche, 396 U.S. 346, 362–363, 90 S.Ct. 532, 541, 24 L.Ed.2d 567 (1970). When a state law imposes heavily unequal burdens on the ability of candidates to obtain a position on the ballot, it places:

"burdens on two different, although overlapping, kinds of rights—the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively. Both of these rights, of course, rank among our most precious freedoms. We have repeatedly held that freedom of association is protected by the First Amendment. And of course this freedom protected against federal encroachment by the First Amendment is entitled under the Fourteenth Amendment to the same protection from infringement by the States." Williams v. Rhodes, 393 U.S. 23, 30–31, 89 S.Ct. 5, 10, 21 L.Ed.2d 24 (1968).

The Supreme Court has also made it clear that when the right of association and the right to vote effectively are infringed, "only a compelling state interest in the regulation of a subject within the State's constitutional power to regulate can justify limiting First Amendment freedoms. NAACP v. Button, 371 U.S. 415, at 438 [83 S.Ct. 328, at 341, 9 L.Ed. 2d 405] (1963)"; Williams v. Rhodes, *supra* at 31, 89 S.Ct. at 11.

The parties do not, of course, contest these basic principles or their applicability to this case. The nub of their opposing claims relates to the nature of the right subject to the requirement of Section 7.2 and the standard by which the City must justify that requirement.

The City has relied on certain language which appears in the case of Snowden v. Hughes, 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497 (1944). There the Supreme Court considered whether the unlawful refusal of state officials to put a candidate who had won a nomination on the ballot gave that candidate a cause of action under the Civil Rights Act. The court stated, at page 7, 64 S.Ct. at page 400:

"The right to become a candidate for state office, like the right to vote for the election of state officers * * * is a right or privilege of state citizenship, not of national citizenship which alone is protected by the privileges and immunities clause."

The City claims that this language, along with that quoted above in Carrington v. Rash, *supra*, gives it sole legislative power to control requirements for running for city office. Therefore, it is contended, under the presumption of constitutionality afforded a legislative act concerning a subject within a legislature's power to regulate, the City's charter provision must be judged by the test of whether the court can conceive of a "rational basis" for the distinction made. See, e. g., McGowan v. Maryland, 366 U.S. 420, 425–428, 81 S.Ct. 1101, 6 L.Ed. 2d 393 (1961); Allied Stores of Ohio v. Bowers, 358 U.S. 522, 527, 79 S.Ct. 437, 3 L.Ed.2d 480 (1959); Kotch v. Board of River Port Pilot Commissioners, 330 U.S. 552, 556, 67 S.Ct. 910, 91 L.Ed. 1093 (1947).

The City's authority for the proposition that Snowden, *supra*, should control is Del Rio v. City of Detroit, Elections

Commission, No. 19,972, 6th Cir., an unreported *per curiam* opinion which concerned Article 4, Section 9, of the Constitution of the State of Michigan, which provides: "[no] person elected to the legislature shall receive any civil appointment within this state * * * during the term for which he is elected." That case did not involve the situation present here, since in the view of the panel, the plaintiffs who sought to have Article 4, Section 9 declared unconstitutional "joined the group voluntarily knowing of the existence of the constitutional provision." In this case, there is no aspect of voluntariness involved in the Charter provision challenged.

Further, a close reading of *Snowden* must lead to the conclusion that it does not foreclose a challenge to election laws on the basis of a claimed violation of Equal Protection. In *Snowden*, the Court stated:

"* * * There is no contention that the statutes of the state are in any respect inconsistent with the guarantees of the Fourteenth Amendment. * * * The insistence is rather that the Board, merely by failing to certify petitioner as a duly elected nominee, has denied to him a right conferred by state law and has thereby denied to him the equal protection of the laws secured by the Fourteenth Amendment.

"* * * Where, as here, a statute requires official action discriminating between a successful and an unsuccessful candidate, the required action is not a denial of equal protection since the distinction between the successful and the unsuccessful candidate is based on a permissible classification. * * *

"The unlawful administration by state officers of a state statute fair on its face, resulting in its unequal application to those who are entitled to be treated alike, is not a denial of equal protection * * *." *Snowden*

v. Hughes, *supra* 321 U.S. at 7–8, 64 S.Ct. at 400.

Here, of course, there has been a challenge to the City Charter based on Equal Protection grounds. The language relied on by the City goes to the applicability of the privileges and immunities clause and does not control here. *Snowden* in fact stands for the proposition that election laws must comport with the Equal Protection Clause. That this is so is shown by the fact that in Turner v. Fouche, *supra*, 396 U.S. at 362, 90 S.Ct. at 541, the Supreme Court stated:

"We may assume that the appellants have no right to be appointed to the Taliaferro County board of education. But the appellants and the members of their class do have a federal constitutional right to be considered for public service without the burden of invidiously discriminatory disqualifications."

and cited *Snowden* for both propositions. It is clear that Snowden v. Hughes does not insulate the City from a challenge to its Charter based on Equal Protection grounds.

What is not presently clear under Supreme Court decisions, however, is whether the presumption of constitutionality and its concomitant, the "rational basis" test, will avail a statute which sets up classifications which must be met by candidates in order to run as opposed to one which sets up classifications that voters must meet in order to vote.

It is clear in the voter's rights context that the Supreme Court considers that it will not. In Reynolds v. Sims, the Court stated:

"[T]he right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, [and] any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized." Reynolds v. Sims, 377 U.S. 533, 562, 84 S.Ct. 1362, 1381, 12 L.Ed.2d 506 (1964).

In Kramer v. Union Free School District, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969), the Court stated:

" * * * This careful examination is necessary because statutes distributing the franchise constitute the foundation of our representative society. Any unjustified discrimination in determining who may participate in political affairs or in the selection of public officials undermines the legitimacy of representative government. * * * Statutes granting the franchise to residents on a selective basis always pose the danger of denying some citizens any effective voice in the governmental affairs which substantially affect their lives. Therefore, if a challenged state statute grants the right to vote to some bona fide residents of requisite age and citizenship and denies the franchise to others, the Court must determine whether the exclusions are necessary to promote a compelling state interest. * * *

"And, for these reasons, the deference usually given to the judgment of legislators does not extend to decisions concerning which resident citizens may participate in the election of legislators and other public officials. * * * Accordingly, when we are reviewing statutes which deny some residents the right to vote, the general presumption of constitutionality afforded state statutes and the traditional approval given state classifications if the Court can conceive of a 'rational basis' for the distinctions made are not applicable. See Harper v. Virginia [State] Bd. of Elections, 383 U.S. 663, 670 [86 S.Ct. 1079, 1083, 16 L.Ed.2d 169] (1966)." Kramer v. Union Free School District, supra at 626–628, 89 S.Ct. at 1889.

In Turner v. Fouche, supra, 396 U.S. at 362, 90 S.Ct. 532, the argument was made that the conclusion reached in Kramer should not apply to a situation which involved exclusions from office holding rather than voting. The Supreme Court found it unnecessary to decide that question since it found that the freeholder requirement there challenged did not meet even the "rational basis" test. The question seems to be an open one at the Supreme Court level. In the Eastern District of Michigan, an answer has been given. Stapleton v. Clerk for City of Inkster, 311 F.Supp. 1187 (E.D.Mich. 1970), raised the question by reason of a qualification for City office that the candidate must have been a property owner for two years. Chief Judge Freeman of this court stated after examination of the authorities: "This court has concluded that the defendant must demonstrate a 'compelling' city interest in order to justify the qualification."

One of the factors underlying Judge Freeman's opinion was the fact that "this requirement also burdens the voter plaintiffs' right to vote. * * * It seems clear to this court that a restriction upon who may be a candidate necessarily affects the efficacy of a person's vote." Stapleton, supra at 1190. This court agrees with Judge Freeman's conclusion.

■ Further support for the proposition may be found in Carter v. Wischkaemper, 321 F.Supp. 1358, 1360 (N.D. Tex.1970), (three-judge court), where Texas statutes setting filing fees for primary elections were challenged by both candidates and voters as violative of their respective rights under the Equal Protection Clause. There the court based its opinion, which struck down the statutes, entirely on the rights of the voters "to vote for a candidate of their own choice," and it distinguished a similar case which reached an opposite result, Wetherington v. Adams, 309 F. Supp. 318 (N.D.Fla.1970) (three-judge court), by saying that:

"The plaintiff in that case was a candidate and the issues were decided on the basis of what were his rights vis-a-vis those of the state * * * in the case at bar we have resolved the issues on the rights of the voters. The cases are, therefore, distinguishable." Carter v. Wischkaemper, supra at 1362–1363.

Still other courts have applied the compelling interest test, arising from the claimed infringement of the rights of voters, to a residency requirement. See, e. g., Lester v. Board of Elections, 319 F.Supp. 505 (D.D.C.1970) (three-judge court). While opinions are by no means unanimous, compare, e. g., Fitzpatrick v. Board of Election Commissioners, 39 U.S.L.Week, 2356 (N.D.Ill. December 21, 1970, three-judge court), and Spillers v. Slaughter, 325 F.Supp. 550 (M.D.Fla. 1971, three-judge court), this court is of the opinion that the better reasoning compels a conclusion that it is the effect that the challenged statute or ordinance has on the rights of voters to assemble for the purpose of furthering their political beliefs and to cast their ballots effectively for the candidate of their choice which must control. Since it is voting rights which are at stake, it is clear that under the Supreme Court decisions discussed above, the standard which the Charter provision here in question must satisfy is the "compelling interest" standard.

### III

The City has argued that the additional one-year residency requirement embodied in Section 7.2 is compelled by its "strong Mayor" form of government. It points out that under its Charter, the Mayor is the chief executive officer of the City with exceedingly broad administrative powers and that the Mayor also has the power to appoint and remove City officials and veto power over all legislation of the City Council. The candidates for the office must, it is therefore contended, understand all the local problems, know the people of the community, and demonstrate local leadership to solve the problems. And in order to assure the voters that these attributes have been secured by a candidate, and to give them a chance to know his character and reputation, the extra year residency requirement is compelled.

Plaintiff, on the other hand, has argued that the extra year serves no function other than to impermissibly burden and screen out persons who desire to run for the office and who meet the requirement to hold elective office. The decision as to whether a candidate is sufficiently familiar with the city and its problems to effectively wield power as Mayor should be left to the voters, he claims, and he further contends that to the extent Section 7.2 attempts to make the decision for the voters, it affects the right to vote by denying it before it can be exercised. Plaintiff also attacks the efficacy of the residency requirement for fulfilling the end which the City claims for it. He argues that the residency requirement is not finely enough tailored to serve the purpose claimed, first, because one's residence is a matter of intent, which is too vague a basis on which to base a qualification, and second, because the standard permits the inclusion of many persons who have, at best, a remote interest in city affairs and, on the other hand, excludes others who have a distinct and direct interest in the community and its problems.

The opposing claims made by plaintiff and the City raise a dual question: First, there is the question whether the City may permissibly limit the right of its voters so as to restrict them to vote only for candidates who understand the local problems, know the people of the community and whose local reputation and character are well known. Second, assuming the City has the power so to limit the right of its voters, there is the question of whether the classification created by the Charter provision is finely enough tailored to meet the demands of the Equal Protection Clause. It is clear that when a dual question of this nature is presented a court must, if it can, decide the Equal Protection claim on the basis of the second question. Kramer v. Union Free School District, 395 U.S. 621, 632, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969).

It is also clear that the three-year residency requirement here does not satisfy "the exacting standard of precision we require of statutes which selectively distribute the franchise." Kramer v. Union Free School District, *supra* at 632, 89 S.Ct. at 1892. It does not satisfy the standard because it really does not relate to it. While precise in its purpose, Section 7.2 is vague in its function. Whether the requirement of this section denies those who desire to vote for plaintiff or someone similarly situated, the equal protection of the law depends on whether all those potential candidates excluded by Section 7.2 are in fact substantially less interested in and knowledgeable about the community and its problems than those the section allows to file. "In other words, the classifications must be tailored so that the exclusion of [plaintiff] and members of his class is necessary to achieve the articulated [municipal] goal." *Id.* It requires little imagination to conceive of an adult citizen of the City of Warren who has lived his entire life there without taking any interest whatsoever in municipal problems, and who would thus not fit the articulated qualifications sought to be insured by the requirement. It is also easy to conceive of a person who may have lived in the City for two and one-half years and gathered sufficient knowledge to be able to have a good understanding of all aspects of the municipality's difficulties.

Given the fact that it is conceded that plaintiff meets the requirements of Section 4.2, it is possible that he may be such a person. Since Section 7.2 operates to exclude him from consideration by the voters of the City, and no compelling municipal interest having been shown, it must fall as being in violation of the Equal Protection Clause. Williams v. Rhodes, *supra*; Turner v. Fouche, *supra*; Kramer v. Union Free School District, *supra*; and Stapleton v. Clerk for City of Inkster, *supra*.