James F. ANTONIO et al., Plaintiffs,

v.

James C. KIRKPATRICK et al., Defendants.

No. 78–4096–CV–C.

United States District Court, W. D. Missouri, C. D.

June 28, 1978.

Alex Bartlett, Jefferson City, Mo., for plaintiffs.

William F. Arnet, Asst. Atty. Gen., Jefferson City, Mo., for defendants.

## MEMORANDUM AND ORDER

ELMO B. HUNTER, District Judge.

Plaintiff James F. Antonio is a candidate for the office of State Auditor of Missouri. He brings this action as a citizen, voter and candidate, seeking an Order of this Court directing that he be certified by the Secretary of State to local election officials as a Republican candidate for that office at the August 1978 primary election. Plaintiffs J.

Anthony Dill and Julian J. Ossman, both active Republicans, seek this Court's Order as citizens and voters to have Antonio's name on the ballot so that they may vote for him in the Republican primary. Defendants James C. Kirkpatrick and John D. Ashcroft are, respectively, the Secretary of State and Attorney General of the State of Missouri.

Pursuant to the provisions of § 115.387, R.S.Mo.1969, defendant Kirkpatrick is under a duty to certify to local election authorities in Missouri, on or before June 20, 1978,[1] lists of candidates who have filed declarations of candidacy for the office of State Auditor. On April 24, 1978, plaintiff Antonio filed in person with defendant Kirkpatrick his "Declaration of Candidate for Nomination" to be a candidate for the office of State Auditor of the State of Missouri on the Republican ticket to be voted for at the August 1978 primary election. Upon receipt of Antonio's declaration of candidacy, and noting the statement therein relative to Antonio's residency within the State of Missouri, defendant Kirkpatrick requested the advice of Attorney General Ashcroft as to whether the declaration should be rejected and whether or not Antonio's name should be certified to local election authorities in the State of Missouri. By letter dated April 24, 1978, defendant Ashcroft advised Kirkpatrick that because of Antonio's lack of residency in Missouri for a period of ten years, Antonio's declaration of candidacy should not be accepted and his name should not be certified to appear on the primary election ballot. By letter of April 25, 1978, Kirkpatrick advised Antonio that his name would not be certified to election authorities for inclusion on the Republican ballot at the August primary as a candidate for State Auditor.

Section 13 of Article IV of the 1945 Constitution of Missouri provides that the "state auditor shall have the same qualifications as the governor." Section 3 of Article IV provides that the "governor shall be at

---

1. Counsel for defendants has advised the Court that a determination rendered before June 30, 1978, would give sufficient time for Antonio's name to be placed upon the ballot before the August primary.

least thirty years old and shall have been a citizen of the United States for at least fifteen years and a resident of the state at least ten years next before election." It is undisputed that, but for the matter of residency within the State of Missouri, plaintiff Antonio has complied with all other requirements of the Constitution and laws of the State of Missouri to have his name placed upon the Republican ballot for the office of State Auditor in the August primary election. It also is undisputed that Antonio has not been a "resident of this state at least ten years next before election."

Plaintiffs challenge the constitutionality of the ten-year residency requirement of Missouri as it applies to the office of State Auditor, and more particularly as it applies to plaintiff Antonio. Specifically, plaintiffs allege that the residency requirement violates the equal protection clause of the Fourteenth Amendment to the United States Constitution by creating a discriminatory classification which is not necessary to promote a compelling governmental interest of the State of Missouri. Plaintiffs assert that their First Amendment rights of association and expression are infringed by the operation of the residency requirement, and that plaintiff Antonio's constitutional right to travel and right to be a candidate for public office are violated by the residency requirement. Further, plaintiffs alleged that the requirement violates the guarantee of republican form of government set forth in Article IV, Section 4, of the United States Constitution, and abridges the rights of plaintiffs Dill and Ossman to vote for the candidate of their choice and to associate in support of him. Accordingly, plaintiffs seek a declaration by this Court that the ten-year residency requirement for the office of State Auditor of Missouri violates the Constitution and laws of the United States and the federally protected rights of these plaintiffs and a declaration that plaintiff Antonio meets the lawful qualifications for the office of Missouri State Auditor. Plaintiffs additionally seek an Order directing defendant Kirkpatrick to accept the declaration of candidacy filed by plaintiff Antonio and to certify Antonio's name to local election authorities for the Republican ballot as a candidate for State Auditor at the August 1978 primary election. Finally, plaintiffs seek an Order enjoining defendant Ashcroft from enforcing in any manner the ten-year residency requirement so as to preclude plaintiff Antonio from being a candidate for the office of State Auditor or plaintiffs Dill and Ossman from voting for plaintiff Antonio.

This cause has been submitted upon the complaint, defendants' answer, a stipulation with fourteen exhibits, and the testimony of plaintiff Antonio and State Auditor Thomas Keyes at a hearing held June 8, 1978. Jurisdiction in this Court is proper under 28 U.S.C. §§ 1343, 2201 and 2202. Following submission of briefs by the parties, this action now is ripe for determination on the merits.

I.

The first step in resolving the issue of the constitutionality of Missouri's durational residency requirement for the office of State Auditor is determining the appropriate equal protection standard to apply. The United States Supreme Court has developed two tests for use when an allegedly unconstitutional classification is at issue. See Developments in the Law-Equal Protection, 82 Harv.L.Rev. 1065 (1969). Under the traditional, or "rational basis," test, the classification will survive an equal protection attack if it is rationally related to a legitimate goal of the state. See *Dandridge v. Williams*, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). If the classification affects a fundamental right, however, or is based upon a "suspect" criterion, then it will be strictly scrutinized, and the state must demonstrate a "clear showing that the burden imposed is necessary to protect a compelling and substantial governmental interest." *Dunn v. Blumstein*, 405 U.S. 330, 341, 92 S.Ct. 995, 1002, 31 L.Ed.2d 274 (1972); see *Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). The choice of standard thus depends upon "the interests affected and the classifica-

tion involved." *Dunn v. Blumstein*, supra, 405 U.S. at 335, 92 S.Ct. at 999. As another court previously has enunciated:

> Semantics aside, the question is resolved judicially by determining wha⁺ is more important to our form of government; the rights protected by the state law in question or the rights infringed by it.

*Chimento v. Stark*, 353 F.Supp. 1211, 1214 (D.N.H.1973), aff'd, 414 U.S. 802, 94 S.Ct. 125, 38 L.Ed.2d 39 (1974).

■■■ The United States Constitution does not guarantee a right to hold public office to any person, but the equal protection clause does guarantee the right to be considered for such an office without the burden of invidiously discriminatory disqualifications. *Turner v. Fouche*, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970); *Wellford v. Battaglia*, 485 F.2d 1151, 1152 (3d Cir. 1973); *McKinney v. Kaminsky*, 340 F.Supp. 289, 294 (M.D.Ala.1972). The disqualification involved here, of course, operates against those persons who have not resided in the State of Missouri for ten or more years. Plaintiffs urge that this disqualification infringes upon plaintiff Antonio's fundamental right to travel interstate, plaintiffs' First Amendment rights of association and individual expression, and plaintiffs' rights to vote and participate effectively in the electoral process. This Court agrees that the so-called "strict scrutiny" test is applicable to this case.

The ten-year residency requirement for State Auditor clearly impacts the political process in Missouri. Although the right to run for public office may not be as important or fundamental as the right to vote itself, the Supreme Court noted the interrelation between restrictions on the right to candidacy and restrictions on the right to vote in *Bullock v. Carter*, 405 U.S. 134, 142–43, 92 S.Ct. 849, 855–856, 31 L.Ed.2d 92 (1972):

> . . . the Court has not heretofore attached such fundamental status to candidacy as to invoke a rigorous standard of review. However, the rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlative effect on voters.

In *Bullock*, the Supreme Court mandated strict scrutiny where the limitation has a "real and appreciable impact on the exercise of the franchise." 405 U.S. at 144, 92 S.Ct. at 856. Such an impact is present in this case. See *Lubin v. Panish*, 415 U.S. 709, 94 S.Ct. 1315, 39 L.Ed.2d 702 (1974); *Wellford v. Battaglia*, supra; *Carter v. Wischkaemper*, 321 F.Supp. 1358, 1360 (N.D.Tex.1970); *Mogk v. City of Detroit*, 335 F.Supp. 698 (E.D.Mich.1971); *Stapleton v. Clerk for City of Inkster*, 311 F.Supp. 1187 (E.D.Mich.1970); *Bolanowski v. Raich*, 330 F.Supp. 724 (E.D.Mich.1971); *McKinney v. Kaminsky*, supra.

In addition, the Supreme Court has recognized that any limitations imposed by a state on the ability of candidates to obtain a position on the ballot necessarily places:

> . . . burdens on two different, although overlapping, kinds of rights—the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively. Both of these rights, of course, rank among our most precious freedoms.

*Williams v. Rhodes*, 393 U.S. 23, 30, 89 S.Ct. 5, 10, 21 L.Ed.2d 24 (1968). This Court similarly recognized the importance of scrutinizing limitations on access to the ballot in *McCarthy v. Kirkpatrick*, 420 F.Supp. 366 (W.D.Mo.1976). See also *Mancuso v. Taft*, 476 F.2d 187 (1st Cir. 1973); *Reynolds v. Sims*, 377 U.S. 533, 562, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964).

Further, the durational residency requirement of ten years for qualification for State Auditor in Missouri substantially affects the right to travel of potential candidates. See *Dunn v. Blumstein*, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); *Shapiro v. Thompson*, supra; *Wellford v. Battaglia*, supra; *Green v. McKeon*, 468 F.2d 883 (6th Cir. 1972).

This Court's determination of the applicability of the strict scrutiny standard in this

case is not a novel approach to the issue. Almost unanimously, federal courts have adopted the same standard in dealing with the issue of durational residency requirements for public office. See *Stapleton v. Clerk for City of Inkster, supra; Hadnott v. Amos,* 320 F.Supp. 107 (M.D.Ala.1970), aff'd, 401 U.S. 968, 91 S.Ct. 1189, 28 L.Ed.2d 318 (1971); *Bolanowski v. Raich, supra; Green v. McKeon, supra; McKinney v. Kaminsky, supra; Wellford v. Battaglia, supra; Draper v. Phelps,* 351 F.Supp. 677 (W.D.Okla.1972); *Alexander v. Kammer,* 363 F.Supp. 324 (E.D.Mich.1973); *Chimento v. Stark,* 353 F.Supp. 1211 (D.N.H.1973), aff'd, 414 U.S. 802, 94 S.Ct. 125, 38 L.Ed.2d 39 (1973); *Headlee v. Franklin County Bd. of Election,* 368 F.Supp. 999 (S.D.Ohio 1973); *Sununu v. Stark,* 383 F.Supp. 1287 (D.N.H.1974); *Fleak v. Allman,* 420 F.Supp. 822 (W.D.Okla.1976). Cf. *Walker v. Yucht,* 352 F.Supp. 85 (D.Del.1972). Indisputably, the State of Missouri has intruded into a constitutionally sensitive area, laced with the penumbrae of protected associational conduct such as travel, voting, and the heart of government, candidacy. Those rights may not be impacted by state action without invoking strict scrutiny.

## II.

This Court's review of the case authority on this subject also convinces it that Missouri's ten-year durational residency requirement for the office of State Auditor does not survive strict scrutiny.

Defendants have set forth four "rational bases" for Missouri's requirement, which they contend also are compelling state interests.[2] Defendants contend that the requirement is necessary (1) to ensure that a public official holding a state-wide office has close ties with the state so that he has the interests of the state at heart and can understand its problems and needs; (2) to

prevent frivolous, fraudulent or unqualified candidates; (3) to ensure a candidate's familiarity with the constituency and the problems of the state; and (4) to thoroughly expose the voters to the candidate prior to election. None of these asserted justifications necessitates the infringements imposed by the ten-year residency requirement challenged herein.

It is true that states, including Missouri, have the unquestioned right to impose reasonable restrictions on availability of the ballot. *People v. Williams,* 193 U.S. 621, 24 S.Ct. 573, 48 L.Ed. 817 (1904); *Carrington v. Rash,* 380 U.S. 89, 91, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965). That right is a police power reserved to the states under the Tenth Amendment to the United States Constitution.[3] *McKinney v. Kaminsky, supra,* 340 F.Supp. at 394; *Bolanowski v. Raich, supra.* It is also true that the interests asserted herein by the state are in some measure worthwhile and even laudable objectives. Plaintiffs do not contend, and this Court certainly does not mean to imply, that durational residency requirements for public office *per se* are impermissible. But a state "may not deny to some the privilege of holding public office that it extends to others on the basis of distinctions that violate federal constitutional guarantees." *Turner v. Fouche, supra,* 396 U.S. at 362–63, 90 S.Ct. at 541. In this case, plaintiffs' rights are impermissibly burdened, for it is difficult to conceive how the requirement of ten years' prior residency is necessary to effectuate any of Missouri's stated objectives.

In these times of media and mass transportation, voters are thoroughly exposed to a candidate, and *vice versa,* throughout the rigorous primary and election campaign process, without the necessity of ten years' prior residency for that purpose. Certainly candidates who so desire can become famil-

---

**2.** Defendant asserts that the "rational basis" test, rather than "strict scrutiny," applies in this case. As this opinion will outline, the result is the same under either test.

**3.** In addition to the office of State Auditor, the State of Missouri has such requirements with

respect to the Governor (Art. IV, § 3), Lieutenant Governor (Art. IV, § 10), State Senators (Art. III, § 6), State Representatives (Art. III, § 4), and judges of the various state courts (Art. V, § 25).

iar with their constituency and the problems of the state without residing here for ten years.

Nor does a candidate's residency of ten years demonstrate that his candidacy is not frivolous or fraudulent, or that he understands the problems and needs of the state. A residency requirement excludes legitimate as well as frivolous candidates. It also fails to ensure that only qualified candidates seek public office. The Missouri constitutional provision permits a ten-year resident of Missouri to be a candidate for State Auditor regardless of his lack of knowledge of the state and its problems, while it excludes more recent arrivals—for example, those who have resided in this state for nine and one-half years—who have had experience in government elsewhere or like plaintiff Antonio have experience in Missouri government, or who simply have made diligent efforts to become well acquainted with Missouri and its governmental operations. As the District Court reasoned in striking down a three-year residency requirement for mayoral candidates in *Bolanowski v. Raich, supra,* 330 F.Supp. at 731:

> It requires little imagination to conceive of an adult citizen of the City of Warren who has lived his entire life there without taking any interest whatsoever in municipal problems, and who would thus not fit the articulated qualifications sought to be insured by the requirement. It is also easy to conceive of a person who may

have lived in the City for two and one-half years and gathered sufficient knowledge to be able to have a good understanding of all aspects of the municipality's difficulties.

In an election campaign, opposing candidates for State Auditor undoubtedly will point out each other's deficiencies, including length of residency if that is a deficiency. The voters are well capable of considering and determining whether a candidate has the ability to carry out the duties of the office, and whether he has the interests of the state at heart. In our representative form of government, "the voters are the arbiters of the suitability of candidates for public office," *Green v. McKeon, supra,* 468 F.2d at 885; *Alexander v. Kammer, supra,* 363 F.Supp. at 326, and their freedom of choice may not be restricted lightly.[4]

The failure of the ten-year requirement for the office of State Auditor to further its stated objective of preventing unqualified candidates is further demonstrated by the case of candidates who, like plaintiff Antonio, are certified public accountants.[5] The evidence in this case reveals that as a group, certified public accountants—particularly those who associate with the so-called "Big Eight" accounting firms—do travel extensively in the furtherance of their careers and therefore frequently fall subject to the disqualification of Missouri's ten-year requirement for State Auditor. Defendants correctly point out that it is not a requirement of Missouri law that candi-

**4.** "Defendants claim that the . . . residency requirement for candidates . . . is reasonable and understandable; that it takes into consideration that a person who has lived in the community for three years should be better acquainted with the problems of the city and with how they should be corrected. Curiously, a citizen who moves into the community thirty days before the election is presumably qualified to choose those best qualified for membership on the commission. Does this mean that voters can learn in thirty days what a prospective candidate can learn in not less than three years? It seems to us that there is here a strange inconsistency. It occurs to us further that the premise upon which the residency requirement rests, that is, that citizens who have resided in the municipality for three years next preceding the election are attached to the com-

munity and by some process are more aware of its problems and possess better solutions is tenuous at best. Who is to say that a late arrival in the community is not best qualified to fill the office here in question?" *Mogk v. City of Detroit, supra,* 335 F.Supp. at 700.

**5.** The State Auditor is responsible for the post-auditing of all governmental agencies and of ninety-eight third and fourth class counties in the state. In addition, any political subdivision can petition the Auditor for an audit. The Auditor's office also administers all general revenue bonds of the state. According to the testimony of Thomas Keyes, the present State Auditor of Missouri, the Auditor's office functions "like a C.P.A. firm."

dates for State Auditor be accountants, and it certainly is true that accountants as a group do not constitute a "suspect" class. Nevertheless, it appears clear to this Court that certified public accountants are professionally well-qualified to serve as chief auditor of the State of Missouri, and the ten-year residency requirement therefore tends to exclude the very group of individuals who may be best suited to perform the tasks of that office.

Plaintiff Antonio is an excellent example. It is conceded that plaintiff Antonio meets all other qualifications for the office of State Auditor, and the record herein further reveals that he is well-educated in the field of accounting[6] and imminently knowledgeable about and experienced in the affairs of the State Auditor's office.[7] He has resided in Missouri for almost eight of the past twelve years.[8] Missouri's durational residency requirement operates to exclude him from consideration by the voters of the State, and no compelling state interest has been shown to justify that exclusion.

▆▆▆▆ In addition, even were Missouri's ten-year residency requirement found to further its asserted objectives, it is clear that the instrument chosen by the State of Missouri to reach those objectives is far too imprecise to justify its continued use. Even though a governmental purpose may be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly reached. *Shelton v. Tucker,* 364 U.S. 479, 488, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960). In other words, the fit of means to ends must satisfy the "tailoring" standard of the equal protection test. *Kramer v. Union Free School Dis-*

*trict,* 395 U.S. 621, 632, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969). As the Supreme Court observed in *Dunn v. Blumstein, supra,* 405 U.S. at 343, 92 S.Ct. at 1003:

It is not sufficient for the State to show that durational residence requirements further a very substantial state interest. In pursuing that important interest, the State cannot chose means that unnecessarily burden or restrict constitutionally protected activity. Statutes affecting constitutional rights must be drawn with 'precision,' . . . and must be 'tailored' to serve their legitimate objectives. . . .

It may well be true that new residents as a group know less about state and local issues than older residents; and it is surely true that durational residence requirements will exclude some people from voting who are totally uninformed about election matters. But as devices to limit the franchise to knowledgeable residents, the conclusive presumptions of durational residence requirements are much too crude. They exclude too many people who should not, and need not, be excluded. . . . Id. at 359–60, 92 S.Ct. at 1012.

Strict scrutiny does not require absolute perfection. *Chimento v. Stark, supra,* 353 F.Supp. at 1214. Nevertheless, it is significant that the District Court noted in upholding New Hampshire's *seven*-year residency requirement for the office of *Governor* in *Chimento v. Stark, supra,* that "the length of the [seven-year] residency requirement may approach the constitutional limit." Missouri's ten-year residency requirement for the office of State Auditor is simply too broad for the purposes it is pur-

6. Mr. Antonio has earned a Bachelor's degree in business, and both Masters and Doctor of Philosophy degrees in accounting. He is a certified public accountant in the State of Missouri, has experience with several different accounting firms, and has taught accounting at the University of Illinois, the University of South Florida, and the University of Missouri.

7. Mr. Antonio presently is Deputy State Auditor of the State of Missouri, a position he has held under three State Auditors. In that posi-

tion, he is chief operating officer of the Auditor's office, second in command, and responsible for the day-to-day management of the office and 100 staff members. He has experience as Acting State Auditor of Missouri, having been appointed to that position by Governor Joseph P. Teasdale in 1977.

8. Mr. Antonio has been a resident of Missouri from summer 1966 until August 1970, from March 1974 through December 1974, and from June 1975 to the present time.

portedly intended to achieve.[9] See *Green v. McKeon, supra,* 468 F.2d at 885.

While history and custom are not the final test of any constitutional question, a survey of the state of the law throughout the nation supports this Court's determination of the unconstitutionality of Missouri's residency requirement for the office of State Auditor. Durational residency requirements for State Auditor are the exception rather than the rule. Only nine states currently have durational residency requirements as conditions of eligibility for the office of Auditor;[10] an additional four states require residency of some duration for the office of Comptroller;[11] six states require merely that their Auditor/Comptroller be a qualified elector of the state.[12] Only five states require residency of five years for the office of Auditor; only Oklahoma requires ten years for the office of Auditor, and that same requirement applies to all other statewide elected officials in Oklahoma. A survey of requirements in the fifty states indicates that only Missouri, Oklahoma, and Louisiana even have a ten-year residency requirement for the office of *Governor.*[13] Thus it is apparent that Missouri's durational residency requirement for the office of State Auditor is the most stringent of any state in the nation.

A review of Missouri history with respect to the office of State Auditor similarly fails to support the finding of any compelling state interest in the ten-year residency requirement.[14] From 1820 until 1952, all State Auditors were appointed; the Constitution of 1820 provided no durational resi-

dency requirements for the office of State Auditor, Secretary of State, State Treasurer, or Attorney General, though there were five-year residency requirements for the offices of Governor and Lieutenant Governor. In 1850 an amendment to the Constitution provided that the offices of State Auditor ("auditor of public accounts"), Secretary of State, Attorney General, and State Treasurer should be elected by the qualified voters of the State. Still, no period of residence was required.

The 1865 Constitution of Missouri adopted extensive provisions setting voting qualifications which also were applicable to office holders. These provisions, adopted in the aftermath of the Civil War, generally disenfranchised Southern sympathizers and required "ironclad" loyalty oaths before voting or holding office. Also adopted were requirements that the Governor and Lieutenant Governor be "white male citizen[s]" and reside in Missouri seven years next before election. The provisions regarding other statewide elected officials were as follows:

> There shall be a secretary of state, a State auditor, a State treasurer and an attorney-general who shall be elected by the qualified voters of the State at the same time, in the same manner, and for the same term of office as the governor. No person shall be eligible to either of said offices unless he be a white male citizen of the United States and at least twenty-five years old, and shall have resided in this state five years next before his election. . . . Article V, Section 16, 1865 Constitution of Missouri.

9. This Court expresses no opinion as to what length of durational residency requirement for the office of State Auditor of Missouri is permissible.

10. Alabama (5 years), Idaho (2 years), Kentucky (2 years), Massachusetts (5 years), Mississippi (5 years), Montana (2 years), New Mexico (5 years), Oklahoma (10 years), Utah (5 years).

11. Florida (7 years), Georgia (6 years), Illinois (3 years), New York (5 years). The Missouri State Auditor does not perform a comptroller function.

12. Nevada, Ohio, South Carolina, Washington, West Virginia, Wyoming.

13. As the Court noted in *Chimento v. Stark, supra,* 353 F.Supp. at 1217, New Hampshire's seven-year durational residency requirement for the office of Governor "may approach the constitutional limit."

14. The facts here are markedly dissimilar to the situation presented in *Chimento v. Stark, supra,* where New Hampshire's residency requirement for Governor had been part of the New Hampshire Constitution since 1784.

The 1865 Constitution did not specify duties of the State Auditor.

The 1875 Constitution, Article V, Section 19, provided that:

No person shall be eligible to the office of Secretary of State, State Auditor, State Treasurer, Attorney-General, or Superintendent of Public Schools, unless he be a male citizen of the United States and at least twenty-five years old, and shall have resided in this State at least five years next before his election.

As in the 1865 Constitution, only duties of the Secretary of State were set forth, with the duties of other officers, including the State Auditor, being generally provided by law.

The 1945 Constitution, under which Missouri functions today, did not carry forth the five-year residency requirement from Article V, Section 19, of the 1875 Constitution. Instead, that requirement was deleted in its entirety and *no* durational residency requirement was imposed in the 1945 Constitution for the offices of Secretary of State, State Treasurer and Attorney General. For the office of State Auditor, the 1945 Constitution did not specifically set forth a residency requirement. Rather, it was provided in Article IV, Section 13, that:

The state auditor shall have the same qualifications as the governor. He shall establish appropriate systems of accounting for all public officials of the state, post-audit the accounts of all state agencies and audit the treasury at least once annually. He shall make all other audits and investigations required by law, and shall make an annual report to the governor and general assembly. He shall establish appropriate systems of accounting for the political subdivisions of the state, supervise their budgeting systems, and audit their accounts as provided by law. No duty shall be imposed on him by law which is not related to the supervising and auditing of the receipt and expenditure of public funds.

Plaintiffs assert that the ten-year residency requirement for the office of State Auditor thus was imposed by the 1945 Constitution accidentally through the general requirement that he possess the same qualifications as the Governor. There is support for that argument in the transcribed record of the Constitutional Convention, which reveals that the ten-year requirement never was debated or even discussed. Instead, the focus of the Convention's discussions was the provisions concerning the duties of the State Auditor, which prior to the adoption of Article IV, Section 13, in 1945, never had been set forth in the Missouri Constitution. In contrast to the ignored first sentence concerning qualifications of the Auditor, those provisions of Section 13 concerning duties of the Auditor received much discussion and heated debate, and were subject to several amendments. The record of the Constitutional Convention, as well as the language of the Section, indicate the Convention's clear intention to set forth that the State Auditor's duties were limited to the post-audit of accounts. No intention to require a lengthy residency requirement for the State Auditor is evidenced by the Section's history or its language. Certainly, the framers of the 1945 Constitution did not express any compelling interest in support of such a requirement.

Further, the 1945 Constitution, in *restricting* the duties of the office of State Auditor to post-audit functions, runs counter to any compelling interest in *increasing* the residency requirement for that office beyond the five years required by the Constitution of 1875. Prior to 1945, the State Auditor was responsible for collection of the state sales and income taxes and certain other fiscal matters. Those functions after 1945 were placed in a new Department of Revenue. In addition, rather than endowing the State Auditor with a comptroller function—a proposal specifically discussed and rejected by the Constitutional Convention—the 1945 Constitution expressly limited the State Auditor to a post-audit function. These limitations prompted one member of the Convention to comment on the convention's floor:

The point I am trying to make is that we have reduced the duties of the  .  .  .

*State Auditor to nothing. I mean they are so insignificant, it seems to me they ought not be in existence.* [Mr. Richard Nacy, Transcript of the Constitutional Debates, at 4033].

Finally, it is significant that the 1945 Constitution imposed no durational residency requirement for the offices of Secretary of State, State Treasurer, or Attorney General. Considering the functions and powers of these other statewide elective offices, and the impact of their exercise of power on the lives of the electorate, it appears patent that no compelling interest has been urged for the disparity in durational residency requirements between candidates for these offices and the office of State Auditor.

■ Thus the history of the office of State Auditor in Missouri reveals no compelling state interest which ever has been expressed—or which now is apparent—for imposing a ten-year durational residency qualification for the office. Accordingly, for all the foregoing reasons, the requirement must fall as violative of the equal protection clause of the Fourteenth Amendment to the United States Constitution. *Williams v. Rhodes, supra; Turner v. Fouche, supra; Kramer v. Union Free School District, supra; Stapleton v. Clerk for City of Inkster, supra; McKinney v. Kaminsky, supra; Wellford v. Battaglia, supra; Green v. McKeon, supra; Bolanowski v. Raich, supra; Mogk v. Detroit, supra; Alexander v. Kammer, supra; Headlee v. Franklin County Bd. of Election, supra.*

### III.

Although this Court properly has examined Missouri's ten-year residency requirement for the office of State Auditor under the "compelling state interest" test of equal protection, it further is the opinion of this Court that the ten-year requirement fails to satisfy the so-called "rational basis" test for the reason that it has neither logic, reason,

nor experience to support it. The requirement of the Missouri Constitution that candidates for State Auditor must reside ten years in this state prior to election simply is not reasonably related to any of the objectives asserted by defendants or to any requirements of that office.[15]

### IV.

For all the foregoing reasons, therefore, it is hereby

ORDERED and declared that the ten-year durational residency requirement for the office of State Auditor of the State of Missouri contained in the 1945 Constitution of Missouri, Article IV, Section 13, violates the equal protection clause of the Fourteenth Amendment to the United States Constitution; and it is hereby

ORDERED that defendant Ashcroft be, and he is hereby, enjoined from enforcing in any manner the ten-year residency requirement for the office of State Auditor contained in the 1945 Constitution of Missouri, Article IV, Section 13; and it is further

ORDERED that defendant Kirkpatrick be, and he is hereby, enjoined from refusing to accept plaintiff Antonio's declaration of candidacy for the office of State Auditor and from refusing to certify plaintiff Antonio's name to local election authorities to appear on the Republican ballot at the August 1978 primary election as a candidate for State Auditor.

---

**15.** *State of Missouri ex rel. Gralike v. Walsh,* 383 S.W.2d 70 (Mo.1972), cited by defendants, upheld the constitutionality of Missouri's one-year residency requirement for the office of state senator against an equal protection challenge. That case is neither controlling nor persuasive here.